Angela M. McEvoy, by her Guardian ad Litem
Stephanie L. Finn, and Susan McEvoy, Plaintiffs-
Appellants,

v.

Group Health Cooperative of Eau Claire, Defendant-
Respondent-Petitioner.

Supreme Court

*No. 96–0908. Oral argument September 3, 1997.—Decided
November 12, 1997.*

(Also reported in 570 N.W.2d 397.)

511

For the defendant-respondent-petitioner there were briefs by *Thomas J. Misfeldt, John P. Richie* and

*Misfeldt, Stark, Richie & Wickstrom*, Eau Claire and oral argument by *John P. Richie*.

For the plaintiffs-appellants there was a brief by *Matthew A. Biegert, Brian H. Sande* and *Doar, Drill & Skow, S.C.*, New Richmond and oral argument by *Matthew A. Biegert*.

Amicus curiae brief was filed by *Edward E. Robinson* and *Warshafsky, Rotter, Tarnoff, Reinhardt & Bloch, S.C.*, Milwaukee for the Wisconsin Academy of Trial Lawyers.

¶ 1. ANN WALSH BRADLEY, J. Group Health Cooperative of Eau Claire, Inc. (GHC), a health maintenance organization, seeks review of a decision of the court of appeals that reversed the circuit court's[1] entry of summary judgment dismissing Angela and Susan McEvoy's complaint. The court of appeals determined that the tort of bad faith can be applied to health maintenance organizations. GHC asserts that the tort of bad faith pertains only to insurance companies. In addition, GHC argues that its patient-related decisions are subject to the medical malpractice statute, Wis. Stat. ch. 655 (1991–92),[2] which precludes any bad faith tort claims. Because we determine that the common law tort of bad faith applies to all health maintenance organizations making out-of-network benefit decisions and that Wis. Stat. ch. 655 does not preclude the McEvoys' claims, we conclude that the circuit court erred in granting summary judgment. Accordingly, we affirm the decision of the court of appeals.

---

[1] Circuit Court for Eau Claire County, Eric J. Wahl, Judge.

[2] Unless otherwise indicated, all future statutory references are to the 1991–92 volume.

## I. Facts and Procedural History

¶ 2. In the fall of 1991, 13-year-old Angela McEvoy began to suffer from anorexia nervosa, a potentially fatal eating disorder characterized by an aversion to food. At the time of diagnosis, Dr. Lawrence McFarlane of GHC was Angela's primary care physician. GHC insured Angela as a dependent of her mother, Susan McEvoy, a government employee and health care benefits policyholder. A portion of that policy required GHC to cover up to 70 days of inpatient psychological care.

¶ 3. GHC is a staff model health maintenance organization (HMO) organized as a cooperative under Wis. Stat. ch. 185. It offers health care services to network participants through staff physicians that operate within GHC's clinics in Eau Claire, Wisconsin. When GHC is unable to care adequately for a network subscriber's health care needs, GHC refers its patients to out-of-network providers. Pursuant to the contractual terms of its subscriber's policy, GHC will pay for that out-of-network care up to the policy's limits.

¶ 4. After confirming his diagnosis of anorexia, McFarlane approached GHC's administration about referring Angela to the inpatient eating disorder program at the University of Minnesota Hospital (UMH). Neither GHC nor its network affiliates had previously treated a patient for anorexia nervosa.

¶ 5. Dr. Stuart Lancer, GHC's Medical Director, was responsible for GHC's cost containment programs and medical management. His approval was necessary for any staff physician referrals to out-of-network providers. At McFarlane's request, Lancer agreed that GHC would cover the cost of a two-week period of inpatient treatment for Angela at UMH. Lancer subsequently approved continued coverage that

totaled an additional four weeks of inpatient care. He never personally met or treated Angela.

¶ 6. After six weeks of treatment by UMH physicians, Lancer decided to discontinue coverage of Angela's care at UMH. This decision was based on phone calls Lancer or members of his administrative staff had with individuals treating Angela at UMH. As one notation in GHC's records indicated:

> SRL [Lancer] OK'ed thru Wed. Jan. 1st 1992 will be Angela's last day. Appt with Lloyd Thrus. (sic) NO MORE EXTENSIONS. SRL doesn't want to talk to them any more. No excuses. Discharge, or no payment.

¶ 7. Both Angela's treating physician and her psychiatrist at UMH opposed Lancer's decision because Angela had not achieved UMH's established eating disorder treatment goals as of the time of discharge. UMH staff also objected to GHC's alternative treatment choice, placement in a newly-formed, in-network, Eau Claire outpatient group therapy session for compulsive overeaters that met only once a week. At the time of Lancer's termination of coverage order, approximately four weeks of inpatient psychological care benefits remained under Angela's contract with GHC.

¶ 8. On December 31, 1991, Angela was discharged back into the care of GHC's network providers. Upon discharge she weighed 95 pounds. Lancer had no further involvement with Angela's care within the GHC network beyond occasionally receiving unsolicited copies of progress notes. Angela relapsed almost immediately. On February 27, 1992, GHC readmitted Angela to UMH's inpatient eating disorder program. At the time of readmission, she weighed 74 pounds.

¶ 9. GHC's coverage of Angela's inpatient psychological care at UMH terminated in late March, 1992. Upon termination of that financial coverage, Lancer's involvement in Angela's case ended. Angela remained at UMH and continued treatment at her own personal expense.[3]

¶ 10. Angela and her mother commenced an action against GHC in the circuit court of Eau Claire County, alleging that GHC "in breach of the policy, and in bad faith, denied and threatened to deny Angela McEvoy coverage for her treatment and failed to authorize appropriate treatment." They demanded compensatory and punitive damages. GHC moved for summary judgment, arguing for dismissal of the suit on the grounds that the McEvoys' action was actually one for medical malpractice governed by Wis. Stat. ch. 655. The plaintiffs, in opposing the motion, pointed to the dual nature of GHC as both a health care provider and an insurer and argued for application of the tort of bad faith.

¶ 11. The circuit court granted GHC's motion for summary judgment, dismissing the McEvoys' complaint. The circuit court decided that application of the tort of bad faith to HMOs would be an "unwarranted extension of the bad faith doctrine." The circuit court then concluded that Lancer's decision to order Angela's discharge was a medical decision properly pursued under medical malpractice law.

¶ 12. The court of appeals reversed the circuit court's grant of summary judgment. In rejecting the

---

[3] Angela and GHC later disputed whether the terms of her contract with GHC required that coverage terminate in late March of 1992. After beginning arbitration of this contract dispute, GHC offered Angela a settlement and agreed to pay for the remainder of her care during her second stay at UMH.

circuit court's view of ch. 655 preclusion, the court of appeals determined that Lancer's medical background did not mean that all challenges to his insurance coverage decisions amounted to medical malpractice claims. Instead, the court of appeals characterized Lancer's actions as administrative insurance coverage decisions properly subject to a bad faith tort claim that should survive summary judgment. GHC petitioned this court for review.

¶ 13. When reviewing a grant of summary judgment we independently apply the same methodology as the circuit court. *See State ex rel. Auchinleck v. Town of LaGrange*, 200 Wis. 2d 585, 591–92, 547 N.W.2d 587 (1996). Where there are no material facts in dispute, we must determine whether the movant is entitled to judgment as a matter of law. *See id.* at 592. In this case, we must determine whether the common law tort of bad faith applies to HMOs. We also must interpret the scope of application of Wis. Stat. ch. 655. Both inquiries present a question of law that we determine *de novo*. *See First Nat. Leasing Corp. v. City of Madison*, 81 Wis. 2d 205, 208, 260 N.W.2d 251 (1977); *State v. Eichman*, 155 Wis. 2d 552, 560, 456 N.W.2d 143 (1990).

## II. The Common Law Tort of Bad Faith

¶ 14. The question of whether HMOs can be sued by subscribers under the common law tort of bad faith traditionally applied to insurance companies is a question of first impression for this court and one that has not received significant discussion in other jurisdictions.[4] To properly resolve this issue, we must consider

---

[4] *See, e.g., Williams v. HealthAmerica*, 535 N.E.2d 717, 719–21 (Ohio Ct. App. 1987) (reversing circuit court's grant of

517

the rationale underlying our previous adoption of the common law tort of bad faith, the nature and purpose of HMOs, the legislature's pronouncements concerning the regulation and organization of HMOs, and the policy implications behind labeling HMOs as insurers under bad faith tort. These considerations convince us that for purposes of the application of the common law doctrine of bad faith, HMOs making out-of-network benefit decisions are insurers.

■

¶ 15. This court explicitly adopted the common law tort of bad faith as applied to first party claims under insurance contracts in *Anderson v. Continental Ins. Co.*, 85 Wis. 2d 675, 686, 271 N.W.2d 368 (1978); *see also Duir v. John Alden Life Ins. Co.*, 573 F. Supp. 1002 (W.D. Wis. 1983). Our adoption of this doctrine recognized that "bad faith conduct by one party to a contract toward another is a tort separate and apart from a breach of contract per se" and that separate damages may be recovered for this tort. *Anderson*, 85 Wis. 2d at 686. The rationale underlying a bad faith cause of action is to encourage fair treatment of the insured and penalize unfair and corrupt insurance practices. By ensuring that the policyholder achieves the benefits of his or her bargain with the insurer, a bad faith cause of action helps to redress a bargaining power imbalance between parties to an insurance contract. *See Craft v. Economy Fire & Casualty Co.*, 572 F.2d 565, 569 (7th Cir. 1978) (applying bad faith tort to remedy imbalance in bargaining power); *Grand Sheet*

---

summary judgment to HMO based on plaintiff's claims of bad faith since issues of material fact remained); *Rederscheid v. Comprecare, Inc.*, 667 P.2d 766, 767 (Colo. Ct. App. 1983) (reinstating plaintiff's bad faith tort claim against an HMO as an insurer).

*Metal Prod. Co. v. Protection Mutual Ins. Co.*, 375 A.2d 428, 430 (Conn. 1977) (applying bad faith tort to protect insured vulnerable at time of claim).

¶ 16. Next we consider the nature and purpose of HMOs. HMOs are modern health care entities that cover over 52.5 million Americans. *See Trends in Deaths Reversed,* Wash. Post, July 25, 1997, at A17. Each HMO is a hybrid entity encompassing characteristics of both traditional health care providers and traditional insurers in such a way as to encourage a restrained use of available health care resources.

¶ 17. HMOs currently exist in three forms. Under a staff model HMO, the HMO employs its own doctors as salaried employees and runs its own delivery facilities such as hospitals and clinics. In a group model HMO, alternatively known as a network HMO, the HMO owns its own facilities, but establishes network health care delivery contracts with individual physicians and physician practice groups that continue to provide fee-for-services care to nonplan participants. Finally, in an Independent Practice Association (IPA) HMO, the HMO contracts with an Independent Practice Association (a partnership or cooperative composed of physicians) which in turn has contracted with groups of individual physicians. *See* Sharon M. Glenn, Comment, *Tort Liability of Integrated Health Care Delivery Systems: Beyond Enterprise Liability*, 29 Wake Forest L. Rev. 305, 311–12 (1994).

¶ 18. The individual providers affiliated with an HMO are part of its health care network. Where such network physicians are not equipped to provide necessary medical care to a subscriber, the HMO, pursuant to its contract, may authorize coverage for payment for out-of-network treatment. HMOs, like insurance com-

panies, may also place contractual limits on their liability for unapproved care.

¶ 19. In the course of the contractual relationship between the HMO and subscriber, a power imbalance similar to that between a classical insurer and policyholder exists. An HMO subscriber has little effective negotiating power since policy terms, like those in insurance contracts, are usually prepackaged and subject to a significant number of regulations and rules. When faced with a problem, HMO subscribers, like many insurance policyholders, may encounter bureaucratic or procedural hurdles in asserting their contractual health care rights. As a practical matter, HMO subscribers are similarly situated vis-a-vis their HMOs as insurance policyholders are to their more traditional insurance companies.

¶ 20. A review of legislative declarations in the Wisconsin statutes specifically applicable to GHC supports our general characterization of HMOs as insurers for bad faith purposes. Like traditional insurance companies, HMOs are required to establish contracts with subscribers with set terms of coverage. *See* Wis. Stat. § 185.981(2). While staff model HMOs organized under Wis. Stat. ch. 185 may not be organized for the sole purpose of providing insurance, and may not enter indemnity contracts, those same HMOs may be authorized to engage in the insurance business. *See* Wis. Stat. §§ 185.981 & 601.04. Such HMOs are also subject to many of the same regulations as insurance companies. *See* Wis. Stat. § 185.983(1).[5] Moreover, Wis. Stat.

---

[5] While these HMOs are excused from compliance with many statutory insurance provisions, they are subject to significant regulation that parallels the insurance industry. They must comply with insurance statutory mandates concerning

§ 600.03 defines "insurer" to include some HMOs. *See* Wis. Stat. § 600.03(23), (27). Wis. Stat. ch. 609 also gives the Office of the Commissioner of Insurance the power to regulate HMOs. Accordingly, based on the practical and legal similarities of HMOs and traditional insurance companies, we determine that the common law tort of bad faith applies to HMOs making out-of-network benefit decisions.

¶ 21. Public policy also supports our decision to equate HMOs and insurers for purposes of applying bad faith tort to HMOs. Research on the benefits of particular medical treatments to patient communities supports contentions by health care financing entities such as HMOs that some medical practices are wasteful. *See* Jack K. Kilcullen, *Groping for the Reins: ERISA, HMO Malpractice, and Enterprise Liability*, 22 Am. J.L. & Med. 7, 23 (1996) (citing Committee on Utilization Management By Third-Parties, Division of Health Care Service, Institute of Medicine, *Controlling Costs and Changing Patient Care? The Role of Utilization Management* 14 (Branford H. Gray & Marilyn J. Field eds. (1989)). Through contractual arrangements with physicians and patients, HMOs are able to exert significant influence on, if not outright control over, the costs of treatment regimens administered to patients,

---

(but not limited to) certificates of authority, deposits and financial services, fees paid to and powers of the Commissioner of Insurance, required reports, and examination of affairs by the Commissioner of Insurance. For a list of provisions from which such HMOs are not exempt, consult Wis. Stat. § 185.983(1). For a comprehensive description of HMOs operating in Wisconsin, visit State of Wisconsin, Office of Commissioner of Insurance, *Information About Wisconsin Health Maintenance Organizations* (visited October 19, 1997) [http://badger.state.wi.us/agencies/oci/hmo_info.htm].

thereby limiting waste. The fears attendant with such arrangements, however, revolve around the economic model of health care financiers focusing on reducing aggregate costs while failing to recognize and to protect adequately the medical needs of individual subscribers.

¶ 22. This fear is particularly acute in the present high-cost medical economy where an adverse benefits ruling means not just that the financier will not provide payment, but also that the medical care itself is effectively denied. The tort of bad faith was created to protect the insured from such harm. *See DeChant v. Monarch Life Ins. Co.*, 200 Wis. 2d 559, 570, 547 N.W.2d 592 (1996). As one court noted in the insurance context, the application of bad faith tort is a means of leveling the playing field when a dispute between an insurer and a subscriber arises. The application of bad faith tort:

> is necessary because of the relationship between the parties and the fact that in the insurance field the insured usually has no voice in the preparation of the insurance policy and because of the great disparity between the economic positions of the parties to a contract of insurance; and furthermore, at the time an insured party makes a claim he may be in dire financial straits and therefore may be especially vulnerable to oppressive tactics. . . .

*Battista v. Lebanon Trotting Ass'n*, 538 F.2d 111, 118 (6th Cir. 1976). Because HMO subscribers are in an inferior position for enforcing their contractual health care rights, application of the tort of bad faith is an additional means of ensuring that HMOs do not give cost containment and utilization review such signifi-

cant weight so as to disregard the legitimate medical needs of subscribers.

¶ 23. Based on the observations discussed above, and the fact situation as alleged in this case, we recognize that HMOs making out-of-network benefit decisions are insurers for purpose of application of the tort of bad faith. The question then becomes how to best distinguish between decisions made by an HMO employee that create liability for medical malpractice and those that place liability on HMOs for bad faith tort. Because HMOs by their nature are an amalgamation of characteristics from health care providers and insurers designed to reduce medical costs, this inquiry does not adhere well to bright line rules, particularly since cases will exist where a particular HMO action or omission may constitute both bad faith and malpractice. However, despite this difficulty, several boundaries can be applied to the inquiry.

¶ 24. First, we emphasize that it is not the case that all malpractice cases against HMO physicians may also be pursued under the guise of the tort of bad faith. The tort of bad faith is not designed to apply to classic malpractice cases arising from mistakes made by a health care provider in diagnosis or treatment. If a surgeon amputates the wrong leg, no claim for bad faith is established. If a primary care physician fails to order an effective diagnostic procedure through negligence or medical mistake, no claim for bad faith arises.

¶ 25. Second, the bad faith cause of action is not limited to decisions made by an HMO's medical director. The official capacity of the decision maker is not the touchstone of our bad faith inquiry. Rather, we are

concerned with the underlying basis for any decision made by an HMO employee that effectively denies coverage for out-of-network care under a subscriber's contract where the weight of internal financial considerations overcomes concern for the subscriber's reasonably necessary medical care.

¶ 26. Third, the facts as alleged in this case present an excellent example of where a bad faith claim should survive a summary judgment motion. Where a staff model HMO refers a subscriber to an out-of-network provider pursuant to that subscriber's needs and contract with the HMO, and it is alleged that the HMO then denies reimbursement for that out-of-network care without an established reasonable basis (i.e., due to internal financial considerations), the HMO is acting purely as an insurer. Because the referral passes primary medical responsibility to the out-of-network provider, the HMO staff member reviewing coverage requests, absent a sufficient showing of participation in treatment, is making a nonmedical, coverage-related decision. Thus, the HMO should be held to the same level of responsibility for its actions as a traditional insurance company. The more closely a particular decision made by an HMO or HMO employee resembles coverage decisions made by traditional insurers, the more appropriate the tort of bad faith becomes.

¶ 27. Fourth, bad faith tort claims cannot arise in out-of-network provider situations unless an HMO unreasonably refuses to provide a service or cover payments to outside providers for which it is contractually obligated. *See Duir*, 573 F. Supp. 1002. Thus, an HMO insurer that denies payment for care because contrac-

tual coverage of such care is reasonably debatable cannot be held liable for bad faith tort. *See Anderson,* 85 Wis. 2d at 691; *Poling v. Wisconsin Phys. Serv.,* 120 Wis. 2d 603, 608, 357 N.W.2d 293 (Ct. App. 1984).

¶ 28. Having acknowledged that reasonably debatable claims are not subject to bad faith, we find unconvincing GHC's contention that it was not required to pay for Angela's extended care since its contract required GHC's prior authorization for expenditures. Such unilateral authority would give GHC the sole power to determine when and to what extent it would be bound by its subscriber contracts. This unbridled discretion may subject such contracts to the argument that they are illusory. The HMO is under a contractual duty to provide or pay for reasonable services to remedy the subscriber's condition up to the subscriber's policy limits. Where an HMO authorizes a referral to an out-of-network provider, the HMO may not end that referral against the recommendation of the treating physicians solely on the basis of cost-containment concerns when the subscriber has not reached the contractual coverage limits. Thus, such an improper denial can constitute a bad faith denial under *Anderson* and the boundaries set out above.

¶ 29. Accordingly, in certain factual circumstances, bad faith claims may properly be maintained against HMOs. To prevail on a bad faith tort claim asserted against an HMO, a plaintiff must plead facts sufficient to show, upon objective review, i) the absence of a reasonable basis for the HMO to deny the plaintiff's claim for out-of-network coverage or care under his or her subscriber contract; and ii) that the HMO, in denying such a claim, either knew or recklessly failed

to ascertain that the coverage or care should have been provided. *See Anderson*, 85 Wis. 2d at 691; *Alt v. American Fam. Mut. Ins. Co.*, 71 Wis. 2d 340, 237 N.W.2d 706 (1976). A plaintiff must make this showing by evidence that is clear, satisfactory, and convincing. *See Baker v. Northwestern Natl. Cas. Co.*, 26 Wis. 2d 306, 316–17, 132 N.W.2d 493 (1965), *overruled on other grounds by DeChant v. Monarch Life Ins. Co.*, 200 Wis. 2d 559, 547 N.W.2d 592 (1996); and Wis JI—Civil 205.

¶ 30. An HMO, regardless of its organizational format, may be liable in bad faith when it has denied a request for out-of-network care or coverage without a reasonable basis. Such a bad faith cause of action may arise when an HMO refuses to consider a patient or physician request for care or coverage, if the HMO makes no reasonable investigation of a request for care or referral put to it, if the HMO conducts its evaluation of a care or coverage request in such a way as to prevent it from learning the true facts upon which the plaintiff's claims are based, or if, as the plaintiffs allege in this case, the HMO conducts its evaluation of a request and bases its decision primarily on internal cost-containment mechanisms, despite a demonstrated medical need and a contractual obligation. *See Anderson*, 85 Wis. 2d at 692–93; *Weiss v. United Fire & Cas. Co.*, 197 Wis. 2d 365, 541 N.W.2d 753 (1995); and Wis JI—Civil 2761.

¶ 31. When a bad faith breach occurs, the HMO is liable for any damages which are the proximate result of that breach. *See DeChant*, 200 Wis. 2d at 571 (citing *Gruenberg v. Aetna Ins. Co.*, 510 P.2d 1032, 1037 (Cal. 1973)). Unlike in medical malpractice cases, punitive damages may be demanded for bad faith where the

defendant is guilty not only of bad faith, but also of "oppression, fraud, or malice." *Anderson*, 85 Wis. 2d at 697 (quoting *Mid-Continent v. Straka*, 47 Wis. 2d 739, 178 N.W.2d 28 (1970)). *But see Lund v. Kokemoor*, 195 Wis. 2d 727, 537 N.W.2d 21 (Ct. App. 1995) (barring punitive damages in medical malpractice cases).

¶ 32. We do not apply the bad faith tort doctrine to HMOs so as to give HMO subscribers carte blanche authority to demand out-of-network treatments or diagnostic procedures beyond what a physician, in exercising his or her medical judgment, finds reasonably necessary. Rather, because bad faith actions are designed to give a weaker party to a contract the benefit of the bargain, we think bad faith actions may arise where the plaintiff is able to show by clear, satisfactory, and convincing evidence that an HMO acted improperly and that financial considerations were given unreasonable weight in the decision maker's cost-benefit analysis.[6] The plaintiffs allege a bad faith

---

[6] In rendering this decision, we are cognizant of the limitations placed upon the scope of our ruling by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1461 (1988). ERISA specifically preempts all state court claims that "relate to" covered employee benefit plans (which include most private employer health care plans). *See* 29 U.S.C. § 1144.

The Supreme Court, in *Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41, 51 (1987), held that state common law causes of action, such as the insurance tort of bad faith, sufficiently "relate to" employee benefits plans to fall under ERISA preemption. Thus our conclusion that the tort of bad faith is applicable to HMOs reaches only a small portion of Wisconsin's populace—those HMO subscribers who either receive health care benefits as part of an ERISA-exempt plan or else purchase their subscription plans individually. The McEvoys' claims are not preempted in this case because Mrs. McEvoy receives her insur-

cause of action against an HMO for failure to cover payments for out-of-network services. Because we recognize the similarity between HMOs and insurance companies and the protective benefits of the bad faith doctrine, we apply the bad faith doctrine to HMOs making such out-of-network benefit decisions.

### III. Scope and Application of Wis. Stat. ch. 655 Preclusion

¶ 33. Having recognized that a cause of action for bad faith may be maintained against an HMO for out-of-network benefit decisions, we next address the issue whether Wis. Stat. ch. 655 precludes the plaintiffs' bad faith cause of action. When conducting statutory interpretation, our primary objective is to ascertain and effectuate the intent of the legislature. *See Ball v. District No. 4, Area Bd.*, 117 Wis. 2d 529, 537–38, 345 N.W.2d 389 (1984). When determining legislative intent, we first examine the language of the statute and will resort to extrinsic aids only if the language is ambiguous. *See id.* at 538.

¶ 34. Wisconsin Stat. ch. 655, "Health Care Liability and Patients Compensation," regulates claims made against individual health care providers and entities providing health care services through their employees. Section 655.002, "Applicability," sets forth those medical actors covered by the chapter. This list includes physicians, nurse anesthetists, partnerships,

---

ance plan as an employee benefit from a government employer. *See* 29 U.S.C. § 1003(b). Nevertheless, because we recognize the similarity between HMOs and insurance companies and the protective benefits of the bad faith doctrine, we apply the common law doctrine of bad faith tort to those HMO contracts that we can reach.

and corporations organized to provide services through physicians and nurse anesthetists, hospitals, and cooperative sickness care associations like GHC.[7]

¶ 35. GHC would have us read ch. 655 as controlling all suits brought against HMOs, whether for medical mistake or for disputed coverage decisions. However, an examination of the language of chapter 655 reveals that the legislature did not intend to go beyond regulating claims for medical malpractice. Wis. Stat. § 655.007 provides:

> On and after July 24, 1975, any patient or the patient's representative having a claim or any spouse, parent or child of the patient having a derivative claim for injury or death *on account of malpractice* is subject to this chapter. (Emphasis added.)

Wis. Stat. § 655.009 states:

> An action to recover damages *on account of malpractice* shall comply with the following. . . .(Emphasis added.)

Wis. Stat. § 655.23(5) specifies:

> [T]he health care provider. . .[is] liable for *malpractice*. . . . (Emphasis added.)

Wis. Stat. § 655.27 states:

---

[7] Wisconsin Stat. § 655.002 holds in pertinent part:

(1) MANDATORY PARTICIPATION. Except as provided in s. 655.003, this chapter applies to all of the following:

. . . .

(f) A cooperative sickness care association organized under ss. 185.981 to 185.985 that operates a nonprofit sickness care plan in this state and that directly provides services through salaried employes in its own facility.

> There is created a patients compensation fund for the purpose of paying that portion *of a medical malpractice claim* which is in excess of the limits expressed in s. 655.23(4). . . . (Emphasis added.)

¶ 36. Thus, the language of ch. 655 consistently expresses the legislative intent that the chapter applies only to medical malpractice claims. While "malpractice" is not defined within the statute, the term is traditionally defined as "professional misconduct or unreasonable lack of skill," or "[f]ailure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession." *See* Black's Law Dictionary 959 (6th ed. 1990).

■

¶ 37. We conclude that ch. 655 applies only to negligent medical acts or decisions made in the course of rendering professional medical care. To hold otherwise would exceed the bounds of the chapter and would grant seeming immunity from non-ch. 655 suits to those with a medical degree. Thus, while certain HMOs may properly be sued for medical malpractice under ch. 655, claims not based on malpractice, such as a bad faith tort action, survive application of that chapter.[8]

¶ 38. The defendant contends that the McEvoys' allegations based on Lancer's decision to deny further coverage for Angela's treatment at UMH are really claims for medical malpractice. If this assertion is accu-

---

[8] The defendant also briefly references an equal protection argument. Because the argument is undeveloped and the defendant fails to cite to any authority in support of its position, we decline to address this argument. *See State v. Flynn,* 190 Wis. 2d 31, 58, 527 N.W.2d 343 (Ct. App. 1994); *State v. Pettit,* 171 Wis. 2d 627, 647, 492 N.W.2d 633 (Ct. App. 1992).

rate, ch. 655 controls this case and we need not proceed further in our analysis. Because the plaintiffs admittedly failed to comply with the mediation requirements of § 655.445,[9] a grant of summary judgment for the defendant would be appropriate. However, as discussed above, this opinion applies the bad faith cause of action to out-of-network coverage decisions by HMOs. Because such actions are based on a "breach of duty imposed as a consequence of the relationship established by contract," and not on an improper medical action or decision resulting from negligence, the causes of action are distinct. *Anderson*, 85 Wis. 2d at 687.

¶ 39. The McEvoys do not allege a malpractice action. Rather, they allege that GHC breached its contract and in bad faith denied and threatened to deny coverage for Angela's out-of-network treatment. Because we recognize that a bad faith cause of action is properly extended to HMOs making out-of-network benefit decisions and that Wis. Stat. ch. 655 does not preclude a bad faith cause of action against an HMO as an insurer, we conclude that the circuit court erred in granting summary judgment to GHC. The defendant is not entitled to judgment as a matter of law and issues of material fact remain. Accordingly, we affirm the decision of the court of appeals.

---

[9] Wisconsin Stat. § 655.445 provides in part:

(1) . . .[A]ny person listed in s. 655.007 having a claim or a derivative claim under this chapter for bodily injury or death because of a tort or breach of contract based on professional services rendered or that should have been rendered by a health care provider shall. . .file a request for mediation. . . .

*By the Court.*—The decision of the Court of Appeals is affirmed.