Thomas E. AUL and Mary Patricia Aul,
Plaintiffs-Appellants,†

v.

GOLDEN RULE INSURANCE COMPANY and
Federation of American Consumers & Travelers,
Defendants-Respondents.

Court of Appeals

*No. 2006AP1035. Submitted on briefs April 17, 2007.
—Decided June 13, 2007.*

2007 WI App 165

(Also reported in 737 N.W.2d 24.)

† Petition to review denied 9/14/07.

227

228

230

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Thomas E. Aul*, of *Law Offices of Thomas E. Aul*, of Delafield.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Thomas A. Cabush*, of *Kasdorf, Lewis & Swietlik, S.C.*, of Milwaukee, and *David A. Anderson*, of *Anderson & Associates, P.C.*, of Carmel, IN.

Before Brown, Nettesheim and Anderson, JJ.

¶ 1. NETTESHEIM, J. Thomas and Mary Patricia Aul are engaged in a dual battle: against Patricia's breast cancer and against Golden Rule Insurance Company for coverage of her treatment. They appeal the summary judgment granted in favor of Golden Rule,

which had issued them a group health policy when Patricia was being medically followed for a breast cyst. The policy included a rider, to which the Auls had reluctantly acquiesced, excluding coverage for loss Patricia might incur from "any disease or disorder of the breasts." When Patricia developed breast cancer nearly two years later and Golden Rule denied their claims, the Auls filed suit alleging breach of contract, bad faith and misrepresentation. They contend that the rider was based on a preexisting condition, and the policy's preexisting condition limitation does not apply to losses incurred over twelve months after the policy's effective date. They also contend the rider is unconscionable.

¶ 2. We agree with the circuit court that the rider was not for a preexisting condition and that it is not unconscionable. We hold that, despite the Auls' strenuous objection to it, the rider is an enforceable part of the contract they negotiated and accepted. We affirm the judgment and the award of fees and costs.

## FACTS AND PROCEDURAL BACKGROUND

¶ 3. The essential facts are not in dispute. Thomas, an attorney since 1969, has been a self-employed solo practitioner since 1993. The Auls had a series of health plans over the years, the changes usually prompted by rising premium costs. When they considered getting new health insurance, Patricia, who has a master's degree, generally investigated potential plans which they both then discussed.

¶ 4. In 2000, when the Auls were insured by Blue Cross & Blue Shield United of Wisconsin through the State Bar of Wisconsin, the premiums "increased dramatically." Looking to find a less costly plan, the Auls contacted Luann Columb of the Columb Insurance

Agency. Columb sells health insurance policies for various companies, including Golden Rule. The Auls applied for health coverage through Golden Rule. The Golden Rule coverage appealed to the Auls because it offered a medical savings account (MSA) feature and lower premiums. To be eligible for Golden Rule coverage, the Auls had to join the Federation of Consumers and Travelers, or FACT, an association which offers its members insurance and other benefits.

¶ 5. Patricia advised Columb that she had breast cysts and abnormal mammograms about which her physician was not concerned. She also disclosed on the Golden Rule application that about three weeks earlier she had had a "recheck" mammogram with ultrasound to be followed up in six months. A Golden Rule underwriter telephoned Patricia for more information and documented that the tests were done to keep track of any changes in a small noncancerous cyst. Shortly thereafter, Golden Rule sent the Auls an amendment to the application reading: "Patricia has a breast cyst which is being followed. The results of all exams were normal." Thomas signed and returned the amendment, and it became part of the application.

¶ 6. Golden Rule issued the Auls a group insurance policy effective August 1, 2000. Before the Auls actually received the policy, Columb notified Patricia that it contained a rider regarding her breasts "for life or some indefinite period." The rider provided:

> *By the attachment of this Rider it is understood and agreed that* the insurance under *this Policy/Certificate is amended* as follows:
>
> > *This policy/certificate does not cover* any loss incurred by Patricia Aul resulting from any disease or disorder of the breasts, including treatment or

> operation therefor and complications therefrom. This rider also excludes reconstructive surgery and complications therefrom. (Emphasis added.)

The Golden Rule underwriting manual requires the breast disorders rider whenever an applicant has a breast cyst of any kind that is under observation.

¶ 7. The Auls considered the rider too far-reaching and not warranted by Patricia's medical history. Patricia told Golden Rule that she and Thomas would weigh everything to decide whether they wanted the policy. They opted to accept it and then to try to have the rider removed. About this same time, the Auls' Blue Cross/Blue Shield coverage ended.

¶ 8. Patricia called Golden Rule about the rider and was told that her cyst prompted the rider. The Golden Rule representative also said that, should Patricia submit medical records demonstrating that the cyst disappeared, "we can review to see if we can remove the rider," but removal was not guaranteed. Columb also telephoned Golden Rule on the Auls' behalf. Patricia's physician, Dr. Gloria Halverson, through her nurse, wrote to Golden Rule explaining that Patricia had regular breast examinations because "her breasts are extremely dense," but "[f]ibrocystic changes . . . without atypia do not predispose to breast cancer." The letter described Patricia's two most recent ultrasound reports as revealing "benign findings" and "no visible worrisome masses." The reports, included with the letter, stated that the ultrasounds were done for "benign-appearing densities" and "follow-up of hypoechoic mass and cyst." The "Fibrocystic Breast Disease" category in Golden Rule's underwriting manual would have permitted a less stringent rider than the one issued, or no rider at all.

236

¶ 9. Golden Rule declined to remove the rider "[d]ue to [Patricia's] medical history" but said it was "willing to reconsider the rider after Patricia has her next recommended follow-up in December." Patricia had the follow-up mammogram, with favorable results, but the Auls did not ask Golden Rule to reconsider at that time because they assumed Columb or Golden Rule would take care of it.

¶ 10. The Auls continued to pay the premiums and Golden Rule coverage remained in effect. Twenty-two months later, in June 2002, Patricia was diagnosed with breast cancer. The Auls submitted approximately $123,000 in claims to Golden Rule. Golden Rule denied coverage based upon the language of the rider.

¶ 11. Between August 18, 2000, and Patricia's cancer diagnosis, Thomas and Patricia took no affirmative measures to have the exclusionary rider removed. On July 8, 2002, however, Thomas filed a grievance with the state Office of the Commissioner of Insurance alleging that the rider represented improper underwriting. In August, Thomas wrote twice to Golden Rule asking them again to reconsider the rider. Patricia's surgeon and oncologist also wrote letters to Golden Rule, both stating that the rider should not have been placed because no known link exists between fibrocystic disease and breast cancer. The surgeon went so far as to say that the rider was "unethically placed." He opined that Patricia's cancer was "strictly related to the breast density and factors unrelated to fibrocystic disease." Golden Rule stood firm.

¶ 12. The Auls commenced this litigation in March 2004 against Golden Rule, Columb and Columb Insurance Agency, later amending their complaint to include FACT as a defendant. The Auls alleged breach of contract; a violation of WIS. STAT. § 632.746

237

(2005–06)[1] regarding preexisting condition exclusions; bad faith; negligence; misrepresentation; and conspiracy. All parties moved for summary judgment.[2] Golden Rule and the Auls stipulated to the dismissal of the Auls' statutory claim, and the circuit court granted summary judgment to Golden Rule and FACT on the remaining issues. The Auls appeal. Additional facts may be supplied where necessary.

## DISCUSSION

¶ 13. The circuit court granted summary judgment to Golden Rule and FACT and dismissed the Auls' breach of contract, bad faith, conspiracy and misrepresentation claims. We first address a procedural issue.[3] The only allegation against FACT in the Auls' amended

---

[1] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

[2] The trial court did not address the summary judgment motion of Columb and Columb Insurance Agency because it dismissed them after they reached a settlement with the Auls.

[3] There actually is a second procedural issue. Golden Rule objects that the Auls raised claims at summary judgment different than what had been pled. The Auls' complaint alleged only that Thomas never "accepted, approved or signed" any document signifying his acceptance of the rider, but then argued at summary judgment that Golden Rule breached the contract by enforcing the rider despite the plain language of the preexisting condition limitation. As to bad faith, the Auls changed their theory from bad faith under Wis. Stat. § 632.746, involving preexisting conditions, to bad faith in underwriting and in its continued denial of coverage based on the rider. Finally, they argued in their summary judgment papers that the rider was unconscionable, but had never pled it at all. The circuit court ruled that since Wisconsin is a notice-pleading state, it would proceed as though all matters had been properly pled. We see no need to review this issue since we affirm on the merits.

238

complaint was that FACT and Golden Rule conspired to misrepresent the type of coverage being sold. The circuit court dismissed the conspiracy claim against FACT and the conspiracy and misrepresentation claims against Golden Rule. Since the Auls do not challenge those rulings on appeal, we summarily affirm the grant of summary judgment in favor of Golden Rule and FACT as to those claims. *See A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 491, 588 N.W.2d 285 (Ct. App. 1998). We address the remaining claims against Golden Rule on the merits.

## *Standard of Review*

¶ 14. We review a decision on summary judgment using the same methodology as the circuit court. *See Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 314–15, 401 N.W.2d 816 (1987). Summary judgment is appropriate where the record demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2). Where the facts are not in dispute, there remain only questions of law, which we review de novo. *Teschendorf v. State Farm Ins. Cos.*, 2006 WI 89, ¶ 9, 293 Wis. 2d 123, 717 N.W.2d 258.

## *Breach of Contract*

¶ 15. The Auls contend that the rider was placed because of Patricia's preexisting cystic breast condition. They argue, therefore, that Golden Rule breached the contract by enforcing the rider when the preexisting conditions limitation plainly expired twelve months after the policy's effective date. In the alternative, they assert that if we disagree that the preexisting condi-

239

tions limitation clearly applies, at the least it becomes ambiguous when read together with the rider. Any ambiguity, they assert, must be resolved in their favor. *See Folkman v. Quamme*, 2003 WI 116, ¶ 16, 264 Wis. 2d 617, 665 N.W.2d 857.

¶ 16. The circuit court found that a reasonable person would not have understood the rider to be a preexisting condition because the rider far exceeds the definition of a preexisting condition.[4] The court concluded that the plain language of the insurance policy rendered the Auls' interpretation unreasonable.

¶ 17. The interpretation of an insurance contract, by which we seek to determine and give effect to the intent of the contracting parties, is a question of law subject to our de novo review. *American Fam. Mut. Ins. Co. v. American Girl, Inc.*, 2004 WI 2, ¶ 23, 268 Wis. 2d 16, 673 N.W.2d 65. We give the language in an insurance contract its common, ordinary meaning—what the reasonable person in the position of the insured would

---

[4] The contract defines a preexisting condition as an illness or injury:

(a) for which the covered person received medical advice or treatment within the 24 months immediately preceding the applicable effective date the covered person became insured under the policy; or

(b) which, in the opinion of a qualified doctor:

 (1) probably began prior to the applicable effective date the covered person became insured under the policy; and

 (2) manifested symptoms which would cause an ordinarily prudent person to seek diagnosis or treatment within the 12 months immediately preceding the applicable effective date the covered person became insured under the policy.

have understood the words to mean. *Van Erden v. Sobczak*, 2004 WI App 40, ¶ 22, 271 Wis. 2d 163, 677 N.W.2d 718.

¶ 18. A completed application is an offer for an insurance contract. 1A LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE 3D § 11:1 (2006). The insurer can accept it, decline it entirely, or impose what conditions it chooses. *Id.*, § 11:3. A rider, or endorsement, may be used to restrict the insurance set forth in the body of the policy. *See Smith v. Dodgeville Mut. Ins. Co.*, 212 Wis. 2d 226, 235, 568 N.W.2d 31 (Ct. App. 1997). Because insurers often issue riders unilaterally, "the insured should not take the receipt of such changes lightly. [Riders] . . . should be read and compared to the existing policy to make sure that the policy has not been altered to the detriment of the insured." 2 RUSS & SEGALLA, COUCH ON INSURANCE 3D § 18:17. Issuing a policy of insurance that does not match the application creates a counteroffer which the potential insured can accept or reject. *See* 1A RUSS & SEGALLA, COUCH ON INSURANCE 3D § 11:7; *see also Erickson v. Mid-Century Ins. Co.*, 63 Wis. 2d 746, 751, 218 N.W.2d 497 (1974). An accepted rider becomes part of the policy and must be construed with it. *See Inter-Insurance Exch. of Chicago Motor Club v. Westchester Fire Ins. Co.*, 25 Wis. 2d 100, 105, 130 N.W.2d 185 (1964). We construe the contract to provide coverage only for risks that the insurer contemplated and underwrote and for which it was paid. *See American Girl, Inc.*, 268 Wis. 2d 16, ¶ 23.

¶ 19. We think it clear that the Auls fully apprehended the rider's scope. Their completed application constituted an offer for insurance to Golden Rule. Golden Rule did not outright reject it, but counterof-

fered with the ridered policy. The rider does not mention cysts but instead unambiguously states that by its attachment the parties understood and agreed that it *amended* the policy to exclude coverage for any loss resulting from any breast disease or disorder. The Auls objected to the rider even before receiving their certificate of insurance, and knew that it applied for some indefinite period, perhaps for life. The parties negotiated personally and through third parties. After weighing their options, including the possibility of a review in six months, the Auls accepted Golden Rule's counteroffer and began paying premiums.

¶ 20. Golden Rule cites a Fifth Circuit case arising on similar facts that addressed the interplay between an exclusionary rider and a preexisting conditions limitation. *See Wynn v. Washington Nat'l Ins. Co.*, 122 F.3d 266 (5th Cir. 1997). The insurer offered modified major medical coverage with a rider for spine disorders after Wynn disclosed in her application that she had been treated for a pulled back muscle. *Id.* at 267. Wynn accepted the rider and about two years later had cervical spine surgery. *Id.* at 268. The insurer denied coverage due to the rider. *Id.* Wynn submitted a physician's affidavit to support her argument that she was owed coverage because the condition requiring the surgery was not a preexisting condition but, if it was, the preexisting condition time period had lapsed. *Id.* at 268–69.

¶ 21. The court observed that an exception endorsement, or rider, is qualitatively different from a preexisting conditions limitation and that an insurer, like an individual, is free to limit its liability. *Id.* at 269. It held that the rider unambiguously limited the insurer's liability. *Id.* Nothing in the rider suggested that it was an extension of the preexisting conditions

242

limitation; rather, it constituted a separate and independent limitation on liability that Wynn signed of her own accord as a condition to receiving insurance. *Id.* The preexisting conditions limitation, by contrast, applied to conditions for which a rider had not been written. *Id.*

¶ 22. And so here. The Auls knew about the comprehensive rider even before receiving the certificate of insurance. They knew it was for some indefinite period, perhaps for life. They knew they could pursue its removal, but were not guaranteed of that outcome. They knew they did not have to accept it and informed Golden Rule that they would have to weigh whether or not to take the policy in view of the rider.

¶ 23. Parties are at liberty to enter insurance contracts which specify the coverage to be afforded as long as the contract terms do not contravene state law or public policy. *Rural Mut. Ins. Co. v. Peterson,* 134 Wis. 2d 165, 170, 395 N.W.2d 776 (1986). But " '[p]ublic policy' is no magic touchstone." *Cieslewicz v. Mutual Serv. Cas. Ins. Co.,* 84 Wis. 2d 91, 103, 267 N.W.2d 595 (1978). This state has more than one public policy, one of which favors freedom of contract. *Id.* A party is not obliged to take out a policy of insurance. *City Bank of Portage v. Bankers' Ltd. Mut. Cas. Co.,* 206 Wis. 1, 4, 238 N.W. 819 (1931). When it does, it may do so upon the terms and conditions as it judges will best protect its interests. *Id.* The fact that a policy is issued to it under terms where no liability arises from a specified loss is not of itself contrary to public policy. *See id.* We presume the Auls knew the limitations of the contract into which they entered. *See id.* They balanced against the coverage limitations the policy's lower rates and its MSA feature and accepted Golden Rule's counteroffer.

## Unconscionability

¶ 24. The Auls contend that the rider renders the Golden Rule insurance contract unconscionable. They argue that Golden Rule used its superior bargaining power to present them with restrictions they essentially had to accept because, having cancelled their Blue Cross/Blue Shield policy and now being forced to disclose the restrictive rider on future applications, the rider jeopardized their insurability with other potential insurers. They assert that under Wis. Stat. § 402.302(1),[5] we may refuse to enforce any part of the contract we find unconscionable.

■

¶ 25. Unconscionability is the absence of meaningful choice on the part of one of the parties, together with contract terms that are unreasonably favorable to the other party. *Wisconsin Auto Title Loans, Inc. v. Jones*, 2006 WI 53, ¶ 32, 290 Wis. 2d 514, 714 N.W.2d 155. We review this issue de novo. *Leasefirst v. Hartford Rexall Drugs, Inc.*, 168 Wis. 2d 83, 89, 483 N.W.2d 585 (Ct. App. 1992). We give weight to the circuit court's decision where its legal conclusion and factual findings are intertwined. *Id.*

■

¶ 26. To be declared invalid as unconscionable, a contract or contract provision must be determined to be both procedurally and substantively unconscionable.

---

[5] Wisconsin Stat. § 402.302(1) provides:

(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

*Wisconsin Auto Title Loans, Inc.*, 290 Wis. 2d 514, ¶ 29. Procedural unconscionability relates to factors bearing on the meeting of the minds of the contracting parties, such as age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms would have been permitted by the drafting party, and whether there were alternative providers of the subject matter of the contract. *Id.*, ¶ 34. Substantive unconscionability pertains to the reasonableness of the contract terms themselves, that is, whether they are commercially reasonable or unreasonably favor the more powerful party. *Leasefirst*, 168 Wis. 2d at 89–90; *Wisconsin Auto Title Loans, Inc.*, 290 Wis. 2d 514, ¶ 36. We determine unconscionability on a case-by-case basis. *Wisconsin Auto Title Loans, Inc.*, 290 Wis. 2d 514, ¶ 33.

■■

¶ 27. The circuit court found that the insurance contract was substantively unconscionable because the rider did not seem medically justified. The court also found, however, that the rider was not procedurally unconscionable. It recognized that insurers nearly always have the upper hand in negotiations with a potential insured and can offer policies on a take-it-or-leave-it basis, but observed that the legislature has addressed the pervasive imbalance by regulating the insurance industry. The court refused to find procedural unconscionability here because to do so would expose almost all insurance contracts to the same fate. We agree with the circuit court.

¶ 28. Both Auls are well educated: Thomas practices business law, Patricia has a master's degree. For years they have assumed the responsibility of securing their own health insurance plans. Their decision to look

for new coverage in 2000 was based on premium cost, not an absence of insurance, and they liked Golden Rule's price and MSA feature. Columb explained both the plan and, as soon as she learned of it, the broad reach of the rider. Removal of the rider after Patricia's follow-up mammogram in December was a possibility, however slim, but the Auls did not pursue it.

¶ 29. The dissent concludes procedural unconscionability is present based on one factor: "[W]hether there were alternative providers of the subject matter of the contract." *See Wisconsin Auto Title Loans, Inc.*, 290 Wis. 2d 514, ¶ 34. It states that the "timing of events made other sources of health insurance problematic." Dissent, ¶ 54. "Problematic" strikes us as falling significantly short of "unconscionable."

¶ 30. We recently examined what a meaningful and reasonable alternative means. In *Coady v. Cross Country Bank, Inc.*, 2007 WI App 26, ¶¶ 29, 35 and n.8, 299 Wis. 2d 420, 729 N.W.2d 732, the court looked at standard-form credit contracts a bank presented on a take-it-or-leave-it basis to unskilled, low-income plaintiffs, several of whom were unemployed and/or disabled. After the plaintiffs filed suit alleging illegal debt collection practices, the bank sought to enforce the credit agreement's arbitration clause, which the plaintiffs contended was unconscionable. *Id.*, ¶¶ 5–6. We determined that even if not literally without alternatives, a party may lack a meaningful choice due to a convergence of factors like grossly unequal bargaining power, terms unreasonably favorable to the stronger party and the weaker party's need for the product or service. *See id.*, ¶¶ 38–39. We found procedural unconscionability because the bank solicited the plaintiffs who, due to their financial circumstances, credit histories and weak

246

bargaining position, were unlikely to refuse one of the few sources of available credit because of an arbitration clause. *Id.*, ¶¶ 39–41.

¶ 31. We disagree that the Auls' situation approximates the plaintiffs' in *Coady*. The power imbalance here was no more striking than that customary between potential insurers and insureds; good or bad, it simply "is." There may have been a dearth of other sources of easily affordable health insurance, but that is a wider social issue and not the issue here. The well-educated Auls, assertedly in good health, decided on their own to shop for new insurance coverage when the cost of their Blue Cross/Blue Shield premiums escalated. They found Golden Rule at about half the cost, and chose it to save money, not as a last resort. It is reasonable to assume that Golden Rule can offer less costly premiums by stringently screening applicants seeking coverage.

¶ 32. The dissent suggests that the Golden Rule rider is unconscionable because it slammed the door on other insurance options. It notes that the Auls have to disclose the limitation on applications with other insurers because the Golden Rule application question asking whether they ever were denied coverage or "had coverage modified (including any medical exclusion riders)" is an industry standard. Dissent, ¶ 54. They do, but the question seeks more than a simple "yes" or "no." If the answer is "yes," the applicant must "list name and give details." The additional information allows a potential insurer to see why other insurers refused coverage so that that insurer can prudently decide eligibility within its underwriting criteria. 6A Russ & Segalla, Couch On Insurance 3d § 89:1.

¶ 33. The Auls assert, and the dissent accepts, that the rider placed a "black mark" on their insurability, but the Auls offer no evidence in support. They do not contend that they applied for other coverage, nor do they explain how they came to the certainty that Patricia became virtually uninsurable for any breast conditions. The burden of proof is on the party claiming unconscionability. *Wisconsin Auto Title Loans, Inc.*, 290 Wis. 2d 514, ¶ 30. As a result of the Golden Rule rider, applications to other insurers might be more time consuming due to providing explanations, but if Golden Rule's rider was medically unsupported, let alone unconscionable, we fail to see why, had they applied elsewhere and given details of Patricia's cystic breast condition, another insurer automatically would have refused coverage.

¶ 34. The Auls understandably were torn between attractively priced health care and accepting a broad rider. With the lower-cost insurance, the Auls gambled that they would not need the disqualified coverage. An insurer collects premiums in a gamble that its insureds will remain healthy. To void the rider because the Auls tragically lost their gamble makes no sense. Under the dissent's view of the law, an insurer which reasonably investigates a suspect health condition and then reasonably includes a rider it believes necessary under its underwriting criteria is nonetheless held to provide coverage simply because another prospective insurer might raise the same question. That turns standard insurance industry practice on its head.

¶ 35. Like the circuit court, we, too, note that the Wisconsin legislature has been active in regulating the insurance industry, resulting in a comprehensive statutory scheme. *See, e.g.,* WIS. STAT. chs. 627–647. In

another insurance context, our supreme court has advised caution before interfering in an area of broad public policy in which the legislature has assumed an active role. *See Nelson v. Davidson*, 155 Wis. 2d 674, 683, 456 N.W.2d 343 (1990). If a new duty is required, "it should be imposed as a statutory one and not an implied judicial one." *Id.* We think that caution is wise, and so decline the Auls' invitation to declare the policy procedurally unconscionable. Therefore, we need not decide if it is substantively unconscionable. *See Wisconsin Auto Title Loans, Inc.*, 290 Wis. 2d 514, ¶ 29 (both kinds of unconscionability must be present).

### Bad Faith

¶ 36. The Auls initially alleged that Golden Rule engaged in bad faith by wrongly denying coverage in violation of WIS. STAT. § 632.746, involving preexisting condition exclusions. After dismissing the statutory claim, they revamped their bad faith claim to allege that Golden Rule engaged in bad faith during the course of underwriting the policy and in its continued reliance on the rider to deny coverage. The circuit court granted summary judgment to Golden Rule on the grounds that Wisconsin does not recognize the tort of bad faith in underwriting.

¶ 37. The Auls challenge the ruling on several grounds. First, they contend that the trial court misconstrued their argument by limiting it to the underwriting process when Golden Rule's bad faith continued after the contract's effective date. They argue that the bad faith comprised Golden Rule's initial misclassification of Patricia's condition as well as its continued reliance on the overbroad rider, before and after the cancer diagnosis, even in the face of additional medical information.

249

¶ 38. We disagree. Perhaps Patricia's long-standing fibrocystic breast disease could have slotted her into a less stringent underwriting category. The fact remains, however, that she also had a breast cyst scheduled for follow-up treatment, which fit a different category prompting Golden Rule to require a broader rider. We also note that the records the Auls themselves submitted to Golden Rule may have sounded a warning bell. Dr. Halverson's letter referenced Patricia's "extremely dense" breasts and one of the ultrasound reports gave Patricia's history as "bilateral benign-appearing densities." Patricia's own surgeon's letter said the cancer was related to breast density.

¶ 39. The Auls admit that they did not provide Golden Rule with the favorable results from Patricia's follow-up mammogram so that Golden Rule might reevaluate its position because they expected that Columb or Golden Rule itself would pursue it. We find this expectation unreasonable. In sum, the Auls and Patricia's medical providers disagree with Golden Rule on the prognostic significance of a breast cyst, but we cannot say that Golden Rule's opinion rises to the level of bad faith.

¶ 40. Next, the Auls contend the circuit court erred because issues of fact remain as to whether Golden Rule denied their claims for coverage in bad faith. We see no error. The Auls' own motion for summary judgment represented their belief that the facts were undisputed and that they therefore were entitled to judgment as a matter of law. It is too late for them to argue that there are issues of material fact preventing it. *See Groteleuschen v. American Family Mut. Ins. Co.*, 171 Wis. 2d 437, 446–47, 492 N.W.2d 131 (1992).

¶ 41. Finally, the Auls submit that a covenant of good faith and fair dealing is implied in every insurance contract and urge us to extend that duty to the underwriting process. They cite to us no case law supporting that position, however, and we found no cases willing to extend the duty of good faith and fair dealing to the underwriting part of the transaction. Indeed, we found the opposite. *See, e.g., Commonwealth Lloyds Ins. Co. v. Downs*, 853 S.W.2d 104, 119 (Tex. App. 1993). Even if we were persuaded that the notion has merit, as an error-correcting court, we are not the appropriate body to set policy. *See Hillis v. Village of Fox Point Bd. of Appeals*, 2005 WI App 106, ¶ 16, 281 Wis. 2d 147, 699 N.W.2d 636.

### Fees and Costs

¶ 42. The circuit court awarded Golden Rule costs pursuant to WIS. STAT. § 814.03(1), which provides that the defendant "shall be allowed costs" if the plaintiff is not entitled to them. The Auls assert that the court had discretion under § 814.03(2) not to award costs because the Auls "recovered" against the settling defendants. We disagree.

¶ 43. WISCONSIN STAT. § 814.03(2) provides:

> Where there are several defendants who are not united in interest and who make separate defenses by separate answers, if the plaintiff recovers against some but not all of such defendants, the court may award costs to any defendant who has judgment in the defendant's favor.

¶ 44. The December 2005 settlement between the Auls and Columb and the Columb Insurance Agency was not a judicial recovery. Rather, the Auls presumably

251

received a sum of money in exchange for dismissing their complaint "with prejudice and without costs to any of the parties." When the motions for summary judgment were decided in January 2006, the only remaining defendants were Golden Rule and FACT, both of whom prevailed against the Auls. Because the Auls are not entitled to costs, Wis. Stat. § 814.03(1) applies. Section 814.03(1) is mandatory, not discretionary. *Taylor v. St. Croix Chippewa Indians*, 229 Wis. 2d 688, 696, 599 N.W.2d 924 (Ct. App. 1999).

¶ 45. Even accepting for argument's sake that Wis. Stat. § 814.03(2) applied, the Auls' contention still would fail. They assert only that awarding costs was discretionary, leaving us to guess why or how the court misused its discretion. We generally decline to address undeveloped arguments. *See McEvoy v. Group Health Coop.*, 213 Wis. 2d 507, 530 n.8, 570 N.W.2d 397 (1997).

## CONCLUSION

¶ 46. The Auls accepted Golden Rule's counteroffer of the rider, which operated to unambiguously amend the contract of insurance. We see no procedural unconscionability or bad faith. We sympathize with the Auls' unfortunate position, but neither our sympathy nor their misfortune can operate to change the contract the parties voluntarily, if not equally enthusiastically, agreed to. We affirm the judgment in all respects.

*By the Court.*—Judgment affirmed.

¶ 47. ANDERSON, J. (*dissenting*). Because I disagree with the majority, majority op., ¶ 27, and the circuit court that "[i]f this court were to hold the procedural process in this case unconscionable, almost

all insurance contracts would be procedurally unconscionable," I respectfully dissent.

¶ 48. As the majority notes, there are two components to unconscionability: substantive and procedural. Majority op., ¶ 26. "Substantive unconscionability addresses the fairness and reasonableness of the contract provision subject to challenge. Wisconsin courts determine whether a contract provision is substantively unconscionable on a case-by-case basis." *Wisconsin Auto Title Loans, Inc. v. Jones*, 2006 WI 53, ¶ 35, 290 Wis. 2d 514, 714 N.W.2d 155. I agree with the conclusion of the circuit court that the insurance contract was substantively unconscionable because the rider did not seem medically justified. Majority op., ¶ 27.

¶ 49. Procedural unconscionability addresses whether there has been a meeting of the minds and a formation of a contract. *Wisconsin Auto Title Loans, Inc.*, 290 Wis. 2d 514, ¶ 34. In assessing procedural unconscionability, a court must consider a number of factors, including:

> age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms would have been permitted by the drafting party, and whether there were alternative providers of the subject matter of the contract.

*Id.*

¶ 50. Unconscionability is determined on a case-by-case basis. *Coady v. Cross Country Bank Inc.*, 2007 WI App 26, ¶ 26, 299 Wis. 2d 420, 729 N.W.2d 732. Unconscionability requires a mixture of substantive unconscionability and procedural unconscionability; the mixture is different for each case. *Id.*

> The more substantive unconscionability present, the less procedural unconscionability is required, and vice versa. A court will weigh all the elements of unconscionability and may conclude unconscionability exists because of the combined quantum of procedural and substantive unconscionability. "To tip the scales in favor of unconscionability requires a certain quantum of procedural plus a certain quantum of substantive unconscionability."

*Wisconsin Auto Title Loans, Inc.*, 290 Wis. 2d 514, ¶ 33 (footnotes omitted).

¶ 51. Having agreed with the circuit court that the contract is substantively unconscionable, I will examine the factors considered in determining procedural unconscionability. All but one of the factors are a "wash"; and, if they were the only factors, I would be tempted to agree with the circuit court that to find procedural unconscionability would require the courts to dabble in public policy already set by the legislature. However, I focus on the final factor, "whether there were alternative providers of the subject matter of the contract." This factor does not focus on the heavily regulated relationship between the insureds and the insurer; rather, it focuses on the insureds' relationship with the universe of potential health insurance companies.

¶ 52. On appeal, the Auls assert:

> Golden Rule . . . restricted the Auls' choice in finding alternate health insurance by . . . issuing its Rider after the effective date of the Contract, and notifying the Auls of the Rider only after the Contract was issued. In addition, by placing the Rider, Golden Rule effectively created a "black mark" on the Auls' insurability with other potential insurers.

¶ 53. The Auls' existing health insurance was set to expire on August 1, 2000. They submitted an application to Golden Rule on June 28, 2000, and a Rider-Amendment to the application on July 27, 2000. Golden Rule issued a policy with an effective date of August 1, 2000, on August 7, 2000, the same day the Auls learned that the policy included a exclusionary rider for disease or disorder of Patricia's breasts. This timing of events ruled out one alternate source of health insurance, renewal of the Blue Cross/Blue Shield policy through the State Bar of Wisconsin, a policy that had not excluded disease or disorder of Patricia's breasts. That policy expired on August 1, 2000.

¶ 54. The timing of events made obtaining coverage from other sources of health insurance problematic. Included on the Golden Rule application was a question that asked, "12c. Has any applicant ever had an application or policy voided, declined, postponed, rated or charged an extra premium, or had coverage modified (including medical exclusion riders) by any health or life insurer? (If yes, list name and give details.)" This question is standard practice in the health insurance industry. 6A LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE 3D § 89.1 (1996). The purpose of the question is to permit the insurer to rate the risk. *Id.* The answer is material to the risk the insurer is willing to assume. *Id.* at § 89.9. A truthful answer to a similar question on any other health insurer's application would highlight to that insurer that another insurance company was so concerned about Patricia's health that it excluded, for an indefinite period, any disease or disorder of her breasts; it is highly doubtful that any health insurer would provide insurance coverage for disease or disorder of Patricia's breasts. This is the "black mark" on the Auls' insurability.

¶ 55. The significance of the lack of meaningful and reasonable alternative sources of health insurance was explained in *Discount Fabric House of Racine, Inc. v. Wisconsin Telephone Co.*, 117 Wis. 2d 587, 345 N.W.2d 417 (1984):

> Implicit in the principle of freedom of contract is the concept that at the time of contracting each party has a realistic alternative to acceptance of the terms offered. Where goods and services can only be obtained from one source (or several sources on non-competitive terms) the choices of one who desires to purchase are limited to acceptance of the terms offered or doing without. Depending on the nature of the goods or services and the purchaser's needs, doing without may or may not be a realistic alternative. Where it is not, one who successfully exacts agreement to an unreasonable term cannot insist on the courts enforcing it on the ground that it was "freely" entered into, when it was not. He cannot in the name of freedom of contract be heard to insist on enforcement of an unreasonable contract term against one who on any fair appraisal was not free to accept or reject that term.

*Id.* at 601 (quoting *Allen v. Michigan Bell Telephone Co.*, 171 N.W.2d 689, 692–94 (Mich. App. 1969)).

¶ 56. "Parties asserting unconscionability are not necessarily required to demonstrate to a factual certainty that they could not have obtained the desired product or service elsewhere under more favorable terms." *Coady*, 729 N.W.2d 732, ¶ 39. However, from the facts of record and the reasonable inferences, I conclude that the Auls' have demonstrated that they lacked a meaningful, alternative means to obtain health insurance of a more favorable basis. *See id.*, ¶ 38.

¶ 57. I am not micromanaging the contract between the Auls and Golden Rule. Nor am I ignoring public policy or invading the heavily regulated health

insurance industry.[1] My conclusion that the Auls lacked an alternative source of health insurance considers the universe of health insurers and how they would react to notice that the Golden Rule policy was modified by a medical exclusion rider.

¶ 58. The Auls had nowhere to turn after August 7, 2000; they had no alternate source of meaningful and affordable health insurance. I conclude that the lack of a meaningful, alternate source of health insurance combined with the substantive unconscionability of the terms of the medical exclusion rider makes the Golden Rule health insurance policy unconscionable; therefore, I respectfully dissent.

---

[1] I note that in *Wisconsin Auto Title Loans, Inc. v. Jones*, 2006 WI 53, 290 Wis. 2d 514, 714 N.W.2d 155, and *Coady v. Cross Country Bank, Inc.*, 2007 WI App 26, 299 Wis. 2d 420, 729 N.W.2d 732, neither the supreme court nor this court had any qualms about looking closely at the procedural process in the heavily regulated area of consumer credit.