**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**September 6, 2023**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP1120**

**STATE OF WISCONSIN**

Cir. Ct. No. 2020CV589

**IN COURT OF APPEALS**
**DISTRICT III**

J&J ENTERPRISES OF DE PERE, LLP,

    PLAINTIFF-APPELLANT-CROSS-RESPONDENT,

  V.

CINCINNATI INSURANCE COMPANY,

    DEFENDANT-RESPONDENT-CROSS-APPELLANT,

ANSAY & ASSOCIATES, LLC,

    DEFENDANT.

---

        APPEAL and CROSS-APPEAL from an order of the circuit court for Brown County: DONALD R. ZUIDMULDER, Judge. *Affirmed in part; reversed in part and cause remanded with directions*.

        Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.   J&J Enterprises of De Pere, LLP ("J&J") appeals a circuit court order granting summary judgment in favor of Cincinnati Insurance Company ("Cincinnati") on J&J's claims for negligence and breach of contract. Specifically, J&J argues that the court erred in concluding that Cincinnati was not liable for failing to advise J&J that it was underinsured.  Cincinnati cross-appeals the court's denial of costs under WIS. STAT. § 814.03 (2021-22).[1]  We reject J&J's arguments in its appeal, but we agree with Cincinnati that an award of costs was mandatory.  We therefore affirm the court's order granting summary judgment to Cincinnati and remand this matter for the limited purpose of awarding costs to Cincinnati.

## BACKGROUND

¶2     This appeal arises from an insurance coverage dispute following a 2019 fire that destroyed several of J&J's buildings.  J&J had an insurance policy with Cincinnati that was issued and delivered through an independent agent, Ansay & Associates, LLC ("Ansay").  The policy provided replacement cost coverage up to the policy limit of $2,086,000.  At the time of the fire, however, Cincinnati was aware that the replacement cost for J&J's buildings was between $3.1 and 3.4 million.

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

¶3     Specifically, in 2017, Cincinnati created a replacement cost valuation report for J&J's property which showed that the property was underinsured.  Cincinnati sent the 2017 report to Ansay with an instruction to review the report with J&J to see whether J&J wanted to increase its coverage.  Ansay did not share the report with J&J, and J&J's policy remained at the existing level of coverage.  In 2018, Cincinnati created a second report showing that J&J remained underinsured.  Cincinnati did not share this 2018 report with Ansay or with J&J.  After the fire, Cincinnati informed Ansay that Cincinnati usually forwards these reports to its agents when they are created, and that the failure to send Ansay the 2018 report "was most likely just an error on our part!"

¶4     After the fire, Cincinnati determined that the replacement cost for J&J's buildings was $4,175,000.  J&J asked Cincinnati to reform the policy due to mutual mistake, but Cincinnati refused to pay more than the policy limit of $2,086,000.  J&J then sued Ansay and Cincinnati, alleging several theories of liability based on negligence and breach of contract.  Ansay cross-claimed against Cincinnati for breaching its agency agreement by failing to forward the 2018 report.[2]  Following Ansay's cross-claim, J&J filed an amended complaint that modified its original breach of contract claim to allege that J&J was a third-party beneficiary of Cincinnati's agency agreement with Ansay.

¶5     Both defendants filed motions for summary judgment on J&J's claims.  The circuit court denied Ansay's motion, concluding that it was "Ansay

_____

[2] The circuit court initially stayed Ansay's cross-claim based on an arbitration clause in the agency agreement.  Cincinnati and Ansay subsequently stipulated to the dismissal of this cross-claim with prejudice and without costs.

that dropped the ball" by not discussing the 2017 report with J&J.[3]  However, the court granted Cincinnati's motion for summary judgment, concluding that Cincinnati did not breach any duty to J&J.

¶6      After the circuit court granted Cincinnati summary judgment, Cincinnati submitted a bill of costs to the court totaling $6,796.75.  The court denied the bill of costs, stating that "[t]he Court did not award costs on the Summary Judgement motion."  Cincinnati filed a motion for reconsideration, which the court denied after a hearing.

¶7      J&J now appeals the circuit court's order granting summary judgment to Cincinnati, and Cincinnati cross-appeals the order denying costs.

## DISCUSSION

### I.  J&J's Negligence Claim

¶8      To prevail on a negligence claim, a plaintiff must establish "four elements: '(1) [a] duty of care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the conduct and the injury; and (4) an actual loss or damage as a result of the injury.'"  *Martindale v. Ripp*, 2001 WI 113, ¶33, 246 Wis. 2d 67, 629 N.W.2d 698 (alteration in original; citation omitted).  "[W]hether a duty exists and the scope of such a duty are questions of law for the courts to decide."  *Hoida, Inc. v. M&I Midstate Bank*, 2006 WI 69, ¶23 n.12, 291 Wis. 2d 283, 717 N.W.2d 17.

---

[3] J&J has since settled its claims against Ansay and stipulated to the dismissal of its complaint against Ansay with prejudice and without costs.  The settlement amount is not part of the record.

¶9    J&J's negligence claim alleged that Cincinnati should be liable for the harm caused by not following up with Ansay or J&J on the 2017 report showing that J&J did not have full replacement cost coverage and by not sending Ansay the 2018 report showing that J&J remained underinsured. The circuit court granted summary judgment on J&J's negligence claim because it could not "ascertain a duty that was breached between Cincinnati and the plaintiff[]." J&J argues that the court erred in granting summary judgment on its negligence claim because there were disputed material facts as to whether Cincinnati had a duty to J&J.

¶10   "We review a decision granting summary judgment de novo, applying the same methodology as the [circuit] court." *Lemke-Wojnicki v. Kolodziaj*, 2002 WI App 316, ¶6, 258 Wis. 2d 950, 655 N.W.2d 212. Summary judgment may be granted when the record "show[s] that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." WIS. STAT. § 802.08(2). "In reviewing a grant of summary judgment, we view the facts in a light most favorable to … the nonmoving party." *CED Props., LLC v. City of Oshkosh*, 2018 WI 24, ¶19, 380 Wis. 2d 399, 909 N.W.2d 136. "Any doubts as to whether a genuine issue of material fact exists should be resolved against … the moving party." *Id.* However, "[t]he ultimate burden of demonstrating that there is sufficient evidence … to go to trial at all … is on the party that has the burden of proof on the issue that is the object of the motion." *Kaufman v. State St. Ltd. P'ship*, 187 Wis. 2d 54, 58, 522 N.W.2d 249 (Ct. App. 1994) (alterations in original; citation omitted).

¶11   In Wisconsin, "generally an insurance agent does not have an affirmative duty to advise a client regarding the availability or adequacy of coverage." *Nelson v. Davidson*, 155 Wis. 2d 674, 682, 456 N.W.2d 343 (1990),

modified by statute on other grounds as stated in *Avery v. Diedrich*, 2007 WI 80, ¶ 26 n.3, 301 Wis. 2d 693, 734 N.W.2d 159. An exception to the general rule may apply "when a statutory obligation or a special relationship arises between agent and buyer." *Id.* Our supreme court has explained that "it is apparent that something more than the standard insured-insurer relationship is required in order to create a special relationship obligating the insurer to advise the policyholder concerning his or her insurance coverage." *Id.* at 683.

¶12 Cincinnati argues that J&J's own admissions establish that there was no special relationship between J&J and Cincinnati that would require Cincinnati to advise J&J about the adequacy of its coverage. Specifically, Jerome Turba, J&J's owner and corporate representative, testified at deposition that J&J did not have any communications with Cincinnati about policy limits. In fact, Turba did not recall any instance when J&J had ever communicated directly with anyone at Cincinnati before the fire. Instead, all of J&J's communications were with Ansay. Turba also testified that there was "no written agreement[]" between Cincinnati and J&J other than the policies. In addition, J&J admits on appeal that it did not pay Cincinnati any separate fee to provide advice to J&J beyond its policy premiums. Based on these undisputed facts, we agree with the circuit court's determination that, as a matter of law, the relationship between Cincinnati and J&J was a standard insured-insurer relationship that did not give rise to a duty on Cincinnati's part to advise J&J about the adequacy of its coverage. *See Nelson*, 155 Wis. 2d at 683.

¶13 Our supreme court's decision in *Sprangers v. Greatway Insurance Co.*, 182 Wis. 2d 521, 547, 514 N.W.2d 1 (1994), further supports this conclusion. In *Sprangers*, the plaintiffs were injured by an intoxicated driver who had been drinking at a VFW clubhouse. *Id.* at 528. The plaintiffs brought claims against

the VFW for their injuries, and they sought to enforce coverage from the VFW's insurer, notwithstanding the fact that the insurance policy had an exclusion for insureds that were "in the business of … selling, serving or furnishing alcoholic beverages." *Id.* at 527. The circuit court declined to grant summary judgment to the insurer, but we reversed, and our supreme court affirmed our decision that the insurer was entitled to summary judgment. *Id.* at 548.

¶14 The supreme court explained that the policy language was clear regarding the exclusion. *Id.* at 527. In addition, the VFW "spoke solely with representatives of [the insurance agency] and had no direct contact with [the insurer]." *Id.* at 548. The court concluded that these facts established, as a matter of law, that the insurer "had no duty in this case to anticipate what liabilities the VFW expected a policy to cover or to identify which exclusions in the policy the VFW may have deemed important." *Id.*

¶15 Like the defendant's insurer in *Sprangers*, the facts demonstrate that Cincinnati never had any direct contact with J&J. Similarly, we see no argument from J&J that the policy language setting forth the replacement cost coverage limit was unclear. Thus, the circuit court concluded, and we agree, that Cincinnati was "entitled to infer" that J&J did not want to increase its coverage.

¶16 J&J argues that the circuit court's conclusion demonstrates that the court was drawing an inference in favor of the moving party, which is impermissible on summary judgment. *See Correa v. Woodman's Food Mkt.*, 2020 WI 43, ¶22, 391 Wis. 2d 651, 943 N.W.2d 535 (a jury has the "unquestionable prerogative to draw inferences from the evidence presented"). J&J, however, misconstrues the court's statement as a usurpation of the jury's fact-finding function. Instead, the court was correctly applying the holding of

7

*Sprangers* to the undisputed facts of this case. Because the policy limit was clear and Cincinnati never communicated directly with J&J, Cincinnati was entitled as a matter of law to conclude that J&J did not wish to increase its coverage. *See Sprangers*, 182 Wis. 2d at 547-48 ("[A]bsent special circumstances, an insurer has no duty to anticipate what liabilities an insured may expect a policy to cover.").

¶17 J&J nonetheless argues that there are genuine issues of fact for trial regarding whether there was a special relationship between J&J and Cincinnati beyond the standard insured-insurer relationship. Specifically, Wisconsin's pattern jury instructions identify five factors for a jury to consider in determining whether a special relationship exists such that the insurer would have a duty to advise the insured about coverage limits. *See* WIS JI—CIVIL 1023.6 (2021). These five factors are:

1. Whether (<u>defendant</u>) held (himself)(herself) out to the public as a skilled insurance advisor or consultant;

2. Whether (<u>defendant</u>) took it upon (himself)(herself) to actually advise (<u>plaintiff</u>) on the coverages (<u>plaintiff</u>) should have beyond the usual relationship of agent and policy holder;

3. Whether the policy holder relied on the agent's expertise;

4. Whether an additional fee was paid to the agent for special consultation and advice; and

5. Whether there was a long established relationship of entrustment between the agent and the insured.

*Id.* J&J argues that the circuit court erred by granting summary judgment on the issue of a special relationship because J&J created genuine issues of material fact regarding several of these factors.

¶18    The first factor is whether Cincinnati held itself out to the public as a skilled insurance advisor or consultant.  *Id.*  J&J points to the following statement on Cincinnati's website:

> Together with your local independent insurance agent, we'll customize an insurance program to help protect the business you've built.  Your agent gets to know you and your business, matching your needs with an insurance program.

¶19    J&J argues that this statement creates "a classic dispute of fact" about whether Cincinnati held itself out as a skilled insurance advisor or consultant.  We disagree with J&J's assertion that this statement helps establish a special relationship between Cincinnati and J&J.  Instead, this statement makes clear that Ansay, J&J's local independent insurance agent, would be responsible for determining J&J's needs and matching those needs with one of the insurance programs offered by Cincinnati.  No reasonable jury could conclude that this statement evidences anything more than a standard insured-insurer relationship between Cincinnati and J&J.

¶20    J&J further argues that the fact that Cincinnati worked through Ansay should not affect our analysis of whether a special relationship existed between Cincinnati and J&J.  J&J does not, however, offer any authority to support this assertion.  Cincinnati directs our attention to ***Meyer v. Norgaard***, 160 Wis. 2d 794, 467 N.W.2d 141 (Ct. App. 1991), in which we concluded that an agent did not hold himself out as a specialist by "recommend[ing] coverage based on his individual assessment of his client's needs and periodically review[ing] those needs."  *Id.* at 801.  Accordingly, we concluded that the agent was entitled to summary judgment.  *Id.* at 802.  Cincinnati's statement on its website regarding customized insurance programs is consistent with the agent's statement in ***Meyer***,

which was not sufficient to create a genuine issue of material fact regarding the existence of a special relationship. We therefore reject J&J's argument that it has created a genuine issue of material fact regarding this first factor.

¶21 The second factor potentially giving rise to a special relationship is whether Cincinnati "took it upon [it]self to actually advise [J&J] on the coverages [J&J] should have beyond the usual relationship of agent and policy holder." *See* WIS JI—CIVIL 1023.6 (2021). J&J argues that by creating the 2017 report and directing Ansay to discuss it with J&J, Cincinnati took it upon itself to actually advise J&J on the coverages that J&J should have. The problem with this argument is that the undisputed facts establish that Cincinnati never "actually advise[d]" J&J about coverages. Indeed, Turba testified that he did not recall Cincinnati ever communicating with J&J about coverage amounts or anything else.

¶22 J&J asserts that Cincinnati's act of instructing Ansay to review the 2017 report with J&J is sufficient to establish this second factor and that Cincinnati should have followed up with Ansay it determined that J&J was still underinsured in 2018. Once again, J&J offers no legal authority to support its assertion that by asking Ansay to review the 2017 report with J&J, Cincinnati was, in fact, taking it upon *itself* to "actually advise" J&J. Nor is this a reasonable inference from the facts.

¶23 The third factor that a jury considers in determining whether a special relationship exists is whether J&J relied on Cincinnati's expertise. *See* WIS JI—CIVIL 1023.6 (2021). J&J points to Turba's testimony that he relied on Ansay's expertise regarding replacement cost coverage limits and always increased coverage based on Ansay's recommendation. J&J does not, however,

point to any evidence that J&J relied specifically on Cincinnati's expertise regarding cost coverage limits. Accordingly, J&J has not satisfied its burden to come forward with facts to create a genuine dispute regarding this factor. *See Kaufman*, 187 Wis. 2d at 58 (at summary judgment, the party that has the burden of proof on an issue has the "burden of demonstrating that there is sufficient evidence … to go to trial at all" (alteration in original; citation omitted)).

¶24     J&J argues that Cincinnati's public representation that it works "together" with independent local agents is sufficient to create a genuine dispute on this third factor. We disagree that a statement on Cincinnati's website, standing alone, is sufficient to create a genuine issue of fact regarding whether J&J relied on Cincinnati's expertise.

¶25     The fourth factor in evaluating the existence of a special relationship is whether J&J paid an additional fee "for special consultation and advice." *See* WIS JI—CIVIL 1023.6 (2021). J&J admits that there is "no direct evidence show[ing] J&J separately paid for advising services." Instead, J&J argues that it assumed that it was paying for advice "in some form" by paying its insurance bills. Paying insurance bills is part of the standard insured-insurer relationship and therefore does not help J&J create a genuine issue of fact regarding whether Cincinnati had a special relationship with J&J. *See Nelson*, 155 Wis. 2d at 683 ("[S]omething more than the standard insured-insurer relationship is required in order to create a special relationship obligating the insurer to advise the policyholder concerning his or her insurance coverage.").

¶26     The fifth and final factor in evaluating whether a special relationship existed is whether there was "a long-established relationship of entrustment" between Cincinnati and J&J. *See* WIS JI—CIVIL 1023.6 (2021). J&J argues that

its long relationship with Ansay is sufficient to satisfy this factor, given the statement on Cincinnati's website that it works "together" with its independent local agents. As with the third factor, we disagree that a statement on Cincinnati's website, standing alone, is sufficient to demonstrate that J&J had a relationship of entrustment with Cincinnati—especially given the undisputed fact that J&J never communicated with Cincinnati directly about any issue.

¶27     J&J also points to the fact that Cincinnati "directly inspected J&J's commercial property and then directed its valuation estimates created with its expertise and industry tools to be provided to J&J." We disagree that a reasonable jury could find a relationship of entrustment based on Cincinnati's unilateral actions. Moreover, the fact that Cincinnati instructed Ansay to relay the 2017 report to J&J further evidences the lack of a relationship of entrustment between J&J and Cincinnati. If Cincinnati had a relationship of entrustment with J&J, it would not make sense for Cincinnati to relay all information and communication through an independent agent. Finally, Cincinnati's inspections in the years immediately preceding the fire do not help J&J establish that any relationship it had with Cincinnati was "long-standing."[4] Thus, we conclude that J&J has failed

---

[4] In addition to the 2017 and 2018 reports, J&J also points to the fact that "[i]n 2015, Cincinnati worked through its agent to arrange and physically visit, inspect and report on J&J's property." We see no developed argument in J&J's opening brief regarding the significance of this 2015 visit, inspection, and report.

In its reply brief, J&J quotes from the 2015 report for the first time, pointing to a statement in the report that it was prepared at Cincinnati's request "as a value added tool for your organization, to help protect your business and your insurance investment." (Formatting altered.)"It is a well-established rule that we do not consider arguments raised for the first time in a reply brief." *Bilda v. County of Milwaukee*, 2006 WI App 57, ¶20 n.7, 292 Wis. 2d 212, 713 N.W.2d 661.

Moreover, we note that the quoted section of the 2015 report further states that "[i]f you have questions about these recommendations or need assistance to properly address them, please contact your insurance agent. Your agent may enlist the help of your local Cincinnati Insurance

(continued)

to create a genuine issue of material fact regarding any of the five factors that a jury could consider in determining whether a special relationship existed between J&J and Cincinnati.

¶28    J&J's last argument regarding its negligence claim is that the circuit court ignored expert testimony from James Leatzow regarding the standard of care in the insurance industry.  According to J&J, Leatzow's testimony established that "Cincinnati's own actions created a duty of care to advise and duty to reform the policy after discovering its errors."  This argument goes nowhere because the questions of whether a duty exists and the scope of that duty are both questions of law for a court's determination.  *See Hoida*, 291 Wis. 2d 283, ¶23 n.12. Moreover, the law is clear that, unless an exception exists, Cincinnati did "not have an affirmative duty to advise [J&J] regarding the availability or adequacy of coverage."  *See Nelson*, 155 Wis. 2d at 682.  The exceptions to this general rule are "when a statutory obligation or a special relationship arises between agent and buyer."  *Id.*  We see nothing in J&J's appellate briefs to indicate that Leatzow's testimony addressed any statutory obligation or any factors that suggest the existence of a special relationship between Cincinnati and J&J.  *See Hoida*, 291 Wis. 2d 283, ¶23 n.12.  Because J&J does not develop any argument that Leatzow's testimony bears on the relevant legal issues, we reject J&J's argument that the court erred by granting summary judgment without addressing this

Companies Loss Control Representative, if needed."  Thus, the 2015 report does not change our determination that there was no special relationship between J&J and Cincinnati giving rise to a duty to advise J&J about coverage levels.  Instead, the report makes clear that any discussion of coverage levels was expected to occur between Ansay and J&J.  Cincinnati did not commit to any further involvement in J&J's determination of an appropriate coverage level, and any further involvement by Cincinnati was dependent on J&J initiating these discussions with Ansay.  These facts are consistent with the circuit court's conclusion that Cincinnati did not have any duty to follow up on these issues with J&J.

testimony. *See Estate of Hegarty v. Beauchaine*, 2006 WI App 248, ¶203 n.41, 297 Wis. 2d 70, 727 N.W.2d 857 (declining to address undeveloped arguments).

## II. J&J's Breach of Contract Claim

¶29 J&J also argues that the circuit court erred by not addressing the breach of contract claim in J&J's amended complaint. Specifically, J&J alleged that it was a third-party beneficiary of the agency agreement between Cincinnati and Ansay and that Cincinnati breached the agency agreement by failing to forward the 2018 report to Ansay, thereby harming J&J.

¶30 J&J relies on *Schell v. Knickelbein*, 77 Wis. 2d 344, 252 N.W.2d 921 (1977), in which our supreme court held that "[t]o maintain an action as a third[-]party beneficiary, a plaintiff must show that the parties to the contract intentionally entered their agreement 'directly and primarily for his [or her] benefit.'" *See id.* at 348 (citation omitted). Moreover, "[i]n order to entitle a stranger to a contract to recover thereon, the contract must indicate an intention to secure some benefit to such third party." *Id.* at 349 (citation omitted). [T]he generally accepted rule is that a third[]party need not demonstrate that he [or she], individually, was intended to benefit from the contract; rather, it is sufficient if the third[]party demonstrates that he [or she] was a member of a class of beneficiaries intended by the parties to benefit from it. *Pappas v. Jack O. A. Nelsen Agency, Inc.*, 81 Wis. 2d 363, 371, 260 N.W.2d 721 (1978).

¶31 J&J argues that the intent to benefit J&J is established by Cincinnati's "public promotion of expert guidance of insurance and past practice of actually doing what it promised for the benefit of J&J." In turn, the agency agreement between Ansay and Cincinnati was intended to "coordinate this promised service for the benefit of the insured," by requiring that "Ansay perform

14

as it directed" and by "hold[ing] Ansay harmless against damages Cincinnati caused servicing policies or engaging in 'inspection services or surveys or those of our subcontractors.'" For these reasons, J&J asserts that Cincinnati should be liable to J&J for breaching its "apportioned duties under the Agency Agreement."

¶32 Cincinnati concedes that the circuit court did not "separately address" J&J's breach of contract claim. However, Cincinnati argues that J&J's claim "is based entirely on the same faulty premises as its" negligence claim. In particular, "[a] party proves its third-party beneficiary status by pointing to specific language in the contract establishing intent." **Becker v. Crispell-Snyder, Inc.**, 2009 WI App 24, ¶11, 316 Wis. 2d 359, 763 N.W.2d 192. In addition, "[t]he benefit proven must be direct; an indirect benefit incidental to the primary contractual purpose is insufficient." **Id.** Here, J&J has not pointed to any specific language in the contract between Ansay and Cincinnati that establishes an intent to directly benefit J&J or a class of beneficiaries that includes J&J. Cincinnati's promotional materials are not part of the agency agreement, nor do arguments about Cincinnati's past practices satisfy J&J's burden to identify specific contractual language establishing the parties' intent to directly benefit J&J.

¶33 We agree with Cincinnati that J&J has failed to satisfy its burden of pointing to specific language in the agency agreement to establish the parties' intent to benefit J&J. Although J&J's brief makes several arguments that rely on its characterization of the purpose and intent of the agency agreement, the only direct quote that J&J references from the agreement is "inspection services or surveys or those of our subcontractors." These nine words, included within a hold

harmless clause, are not sufficient to establish the parties' intent to directly benefit J&J or other insureds.[5]

¶34 Moreover, we agree with Cincinnati that J&J's claim to third-party beneficiary status fails for the reasons set forth in *Schilling by Foy v. Employer's Mutual Casualty Co.*, 212 Wis. 2d 878, 569 N.W.2d 776 (Ct. App. 1997). In *Schilling*, the plaintiff argued that, as a student, he "was a third[-]party beneficiary of the employment contract between [his teacher] and the school district." *Id.* at 881. We squarely rejected the plaintiff's argument that it was "sufficient to point out that provisions regarding teachers' responsibilities for supervision of students benefit students." *Id.* at 890. We explained that

> students are incidental beneficiaries of all teachers' employment contracts, and, indeed, all contracts the school district enters into for services to the students. However, this does not satisfy the burden of showing that this teacher and this school board entered into this contract primarily and directly for the benefit of students. No case cited by Schilling, and none we have been able to discover, suggest that the test for a third[-]party beneficiary can be so easily satisfied.

---

[5] In a footnote, J&J cites two additional cases to support its argument that it was a third-party beneficiary of the agency agreement between Ansay and Cincinnati. *See State ex rel. Journal/Sentinel, Inc. v. Pleva*, 151 Wis. 2d 608, 616-17, 445 N.W.2d 689 (Ct. App. 1989), and *Mercado v. Mitchell*, 83 Wis. 2d 17, 28, 264 N.W.2d 532 (1978). Neither case is helpful to J&J.

In *State ex rel. Journal/Sentinel, Inc.*, the plaintiff pointed to specific language in a lease to support its argument that the lease was intended to benefit third parties. *See State ex rel. Journal/Sentinel, Inc.*, 151 Wis. 2d at 611. As explained above, J&J has failed to identify specific language in the agency agreement showing that Ansay and Cincinnati intended to benefit any third party.

In *Mercado*, our supreme court concluded that a local ordinance requiring insurance "primarily [for] the protection of third parties" should be "read into the [insurance] policy." *Mercado*, 83 Wis. 2d at 29. J&J does not point to any similar statute or ordinance that we should read into the agency agreement.

16

*Id.* We can similarly reject J&J's argument here. While insureds are incidental beneficiaries of agency agreements, this conclusion does not establish that Ansay and Cincinnati "entered into this contract primarily and directly for the benefit of" J&J or other insureds. *See id.*

## III. J&J's Reformation Claim

¶35 J&J further contends that the circuit court should have addressed its claim that Cincinnati acted in bad faith by refusing to reform the insurance policy to provide coverage at full replacement cost. "A cause of action for reformation of an insurance policy is allowed when the one seeking reformation shows that because of fraud or mutual mistake the policy does not contain provisions desired and intended to be included." *Trible v. Tower Ins. Co.*, 43 Wis. 2d 172, 182, 168 N.W.2d 148 (1969) (citation omitted). Here, J&J contends that it was entitled to reformation "based on mutual mistake where a mistake cause[d] a policy to be issued that does not contain requested coverage." J&J further argues that Cincinnati acted in bad faith by hiding facts that supported reformation. *See Trinity Ev. Luth. Church & Sch. – Freistadt v. Tower Ins. Co.*, 2003 WI 46, ¶¶1-4, 7-8, 261 Wis. 2d 333, 661 N.W.2d 789.

¶36 "Mutual mistake is proven when the party applying for insurance proves that he or she made certain statements to the agent concerning the coverage desired, but the policy issued does not provide the desired coverage." *Lenz Sales & Serv., Inc. v. Wilson Mut. Ins. Co.*, 175 Wis. 2d 249, 257-58, 499 N.W.2d 229 (Ct. App. 1993). J&J points to "evidence showing it consistently requested full replacement cost coverage and … was relying on expert advice and direction for setting the necessary dollar level accordingly." J&J further argues that "Ansay's knowledge of the policy holder's instructions and the agent's errors in

17

communicating are imputed to Cincinnati as a matter of law." *See **Artmar, Inc. v. United Fire & Cas. Co.***, 34 Wis. 2d 181, 187, 148 N.W.2d 641 (1967); ***Vandenburg v. Continental Ins. Co.***, 2001 WI 85, ¶54, 244 Wis. 2d 802, 628 N.W.2d 876; ***Scheideler v. Smith & Assocs., Inc.***, 206 Wis. 2d 480, 486, 557 N.W.2d 445 (Ct. App. 1996).

¶37    Cincinnati argues that J&J's claim for reformation based on mutual mistake fails for three reasons. First, there was no mistake here because "the undisputed facts show that Cincinnati issued the Policy with the limits requested by J&J and Ansay[.]" *See **Lenz***, 175 Wis. 2d at 257-58 (plaintiff's argument for reformation fails when the insurer did in fact issue a policy with the coverage requested by the insured). Second, any mistake by Ansay cannot be imputed to Cincinnati because the circuit court found that Ansay was an independent contractor. Third, under agency law, "an agent's knowledge of the agent's own conduct is not imputed to the principal when the conduct contravenes an unequivocal instruction furnished by the principal." RESTATEMENT (THIRD) OF AGENCY § 5.03 (AM. L. INST. 2006). Here, Cincinnati specifically directed Ansay to review the 2017 report with J&J.

¶38    J&J's reply brief fails to address Cincinnati's second and third arguments. Failing to address a respondent's argument in a reply brief "may be taken as a concession." ***United Coop. v. Frontier FS Coop.***, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (citing ***Schlieper v. DNR***, 188 Wis. 2d 318, 322, 525 N.W.2d 99 (Ct. App. 1994)). Thus, we could reject J&J's reformation claim on that basis alone.

¶39    However, we also agree with Cincinnati that J&J's claim fails under *Lenz*. In *Lenz*, the insured requested full replacement cost coverage, and the

insurer issued a policy that provided replacement cost coverage in the amount of $18,500. *See Lenz*, 175 Wis. 2d at 256. There was no dispute that, at the time the policy was issued, $18,500 would provide full replacement cost coverage. *See id.* Several years later, however, the insured's property was destroyed by a fire and the replacement costs were greater than the $18,500 policy limit. *See id.* The insured sought reformation, arguing that there was a mutual mistake based on its stated intent to have full replacement cost coverage. *See id.* at 257-58. We rejected the argument that there was any mutual mistake, given that the policy that was issued gave the insured what it had requested. *See id.* at 258. Here, J&J makes no argument that the replacement cost coverage of $2,086,000 was inadequate at the time the policy was first issued almost a decade before the fire. We therefore see no basis for distinguishing the present case from *Lenz*, in the absence of any evidence to indicate that J&J did in fact request higher replacement cost coverage prior to the fire.

¶40 In contrast, none of the reformation cases on which J&J relies involve the failure to implement a higher coverage amount. Instead, the reformation cases cited by J&J involve an agent's failure to implement a specific type of coverage into the policy. *See Artmar*, 34 Wis. 2d at 190 (agent "knew that [insured] desired some insurance coverage on the outbuilding" but failed to write that coverage into the policy); *Vandenberg*, 244 Wis. 2d 802, ¶¶56-57 (finding a genuine issue of fact for trial based on evidence that the agent knew that the insured was a day care provider and had previously purchased a policy that included coverage for the day care business); *Scheideler*, 206 Wis. 2d at 482

(insured "had underinsured motorist (UIM) coverage under their policy … until their agent … mistakenly deleted that coverage").[6]

¶41    In addition, none of the reformation cases on which J&J relies involve an agent's failure to initiate a conversation about coverages or coverage limits in the first instance.  We therefore decline to apply the holdings of these cases beyond their immediate context because extending the remedy of reformation in this manner would eviscerate our supreme court's conclusion that insurers do not, as a general matter, have a duty to advise about the type or amounts of coverage that an insured should purchase.  *See Nelson*, 155 Wis. 2d at 683-84.  We therefore conclude that J&J was not entitled to reformation and reject J&J's arguments that Cincinnati acted in bad faith.

¶42    For these reasons, we conclude that the circuit court properly granted summary judgment to Cincinnati.

## IV.  Failure to Award Costs to Cincinnati

¶43    Cincinnati cross-appeals the circuit court's decision not to award costs to Cincinnati as the prevailing party on summary judgment.  The question of whether a defendant is entitled to costs is governed by WIS. STAT. § 814.03.

---

[6] J&J also cites *Welch v. Fire Association of Philadelphia*, 120 Wis. 456, 98 N.W. 227 (1904).  However, that decision addresses estoppel, not reformation.  J&J does not develop any argument about how *Welch* should affect our analysis of J&J's reformation claim.  We decline to consider undeveloped arguments.  *See SEIU, Local 1 v. Vos*, 2020 WI 67, ¶24, 393 Wis. 2d 38, 946 N.W.2d 35 ("We do not step out of our neutral role to develop or construct arguments for parties; it is up to them to make their case.").

We further note that J&J has cited several authorities for the first time in its reply brief to provide additional support for various arguments.  As noted above, generally "we do not consider arguments raised for the first time in a reply brief."  *See Bilda*, 292 Wis. 2d 212, ¶20 n.7.

Specifically, subsec. (1) provides that "[i]f the plaintiff is not entitled to costs under [WIS. STAT. §] 814.01(1) … the defendant shall be allowed costs to be computed on the basis of the demands of the complaint." Sec. 814.03(1). Subsection (2) provides that "[w]here there are several defendants who are not united in interest and who make separate defenses by separate answers, if the plaintiff recovers against some but not all of such defendants, the court may award costs to any defendant who has judgment in the defendant's favor." Sec. 814.03(2).

¶44 The circuit court determined that it would be inequitable to award Cincinnati costs against J&J because "at the time of the motion, [Cincinnati] did not ask for costs nor did [Cincinnati] put [J&J] on notice or [Ansay] on notice that that would be an issue." The court also indicated that it believed that an award of costs was discretionary under WIS. STAT. § 814.03(2), because J&J and Ansay had reached a settlement before the court ruled on the merits of J&J's claims against Ansay.

¶45 Cincinnati argues that the circuit court was incorrect regarding whether J&J and Ansay were on notice that Cincinnati was seeking costs. In making its summary judgment motion, Cincinnati concluded by asking "that it be awarded all costs and fees allowed by law." In addition, J&J advised the court that it did not object to Cincinnati's bill of costs. Cincinnati further argues that notice "is irrelevant" because under the applicable statutes, "the prevailing party on summary judgment is automatically entitled to recover costs," subject to specified exceptions that do not apply here. *See Aul v. Golden Rule Ins. Co.*, 2007 WI App 165, ¶44, 304 Wis. 2d 227, 737 N.W.2d 24 (unless the plaintiff has "a judicial recovery" from another defendant, costs must be awarded under WIS. STAT. § 814.03(1)).

¶46    J&J argues that an award of costs is discretionary under WIS. STAT. § 814.03(2), which states that the circuit court "may award costs" in cases where "the plaintiff recovers against some but not all … defendants." *See id.*  J&J argues that, at the time it granted summary judgment to Cincinnati, it recognized that J&J was likely to prevail in its action against Ansay.  Thus, the court had discretion to decline to award fees to Cincinnati.

¶47    We agree with Cincinnati that J&J's argument is foreclosed by our decision in *Aul*.  In *Aul*, the plaintiffs sought to recover medical expenses associated with breast cancer treatment, notwithstanding a rider in their health insurance policy that disclaimed coverage for "any loss resulting from any disease or disorder of the breasts."  *Aul*, 304 Wis. 2d 227, ¶¶6-11.  When the insurer declined to provide coverage, the plaintiffs filed a complaint against several defendants, including their insurance carrier and agent, alleging several theories of liability.  *Id.*, ¶12.  The plaintiffs settled their claims against the agent, and the circuit court granted summary judgment to the other defendants.  *Id.*, ¶¶12-13, n.2.  The court also awarded costs to the defendants who prevailed at summary judgment.  *Id.*, ¶42.  The plaintiffs appealed the award of costs, arguing that the court's decision was discretionary under WIS. STAT. § 814.03(2), because the plaintiffs had "recovered" from the agent.  *Aul*, 304 Wis. 2d 227, ¶42.  We disagreed, explaining that a settlement is "not a judicial recovery" for the purposes of sub. (2).  *Aul*, 304 Wis. 2d 227, ¶44.  Therefore, an award of costs was mandatory under § 814.03(1).  *Aul*, 304 Wis. 2d 227, ¶44.

¶48    J&J contends that *Aul* is distinguishable based on the timing of the circuit court's summary judgment decision in that case.  In *Aul*, the court granted summary judgment after the plaintiffs had settled with the insurance agent.  *Id.*  In contrast, at the time the court granted summary judgment to Cincinnati in the

present case, the court believed that J&J had "very strong evidence to support [its] claim" against Ansay. We disagree that the timing of summary judgment is a basis for distinguishing our conclusion in *Aul* that a settlement "is not a judicial recovery" for the purposes of WIS. STAT. § 814.03(2).

¶49 An award of costs is mandatory under WIS. STAT. § 814.03(1). *See, e.g.*, *Sampson v. Logue*, 184 Wis. 2d 20, 27, 515 N.W.2d 917 (Ct. App. 1994) (the statutory phrase "'the defendant shall be allowed costs' is plain on its face" (citation omitted)). We therefore agree with Cincinnati that the circuit court erred in declining to award costs. Accordingly, we remand for the limited purpose of awarding costs to Cincinnati.

¶50 Costs on appeal and cross-appeal to Cincinnati.

*By the Court.*—Order affirmed in part; reversed in part and cause remanded with directions.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.